383 So.2d 1040 (1980)
HORACE MANN INSURANCE COMPANY
v.
CASUALTY RECIPROCAL EXCHANGE.
No. 13024.
Court of Appeal of Louisiana, First Circuit.
February 13, 1980.
*1041 James H. Morgan, III, Baton Rouge, for plaintiff-appellee, Horace Mann Ins. Co.
Boris F. Navratil, Baton Rouge, for defendant-appellant, Casualty Reciprocal Exchange.
Before EDWARDS, LEAR and GREENE, JJ.
GREENE, Judge.
This suit arises out of an automobile collision and the subsequent negotiations to settle the resulting claims undertaken by the insurers for each party to the accident. This suit involves only the alleged liability of one insurer to the other.
On April 4, 1974 a vehicle driven by Ralph B. Callens (Callens) collided with a vehicle operated by David Ellzey (Ellzey). Casualty Reciprocal Exchange (CRE) was Callens' liability insurer. Ellzey had an accident and disability policy with Horace Mann Insurance Co. (Mann). Ellzey never made a claim against Callens or CRE but did collect more than $8,000 from Mann. After making the bulk of these payments Mann asserted as subrogee of Ellzey a claim against CRE and Callens.
On September 26, 1974 CRE responded to the claim asserted by Mann. In a letter sent to Mann on that date by the Central Louisiana Claims Service, CRE's authorized claims representative, CRE informed Mann that its policy limits were $5,000 and offered this amount in exchange for a full release by Ellzey and Mann of both CRE and Callens from any further liability. CRE accompanied this letter with a draft made payable to both Mann and Ellzey in the amount of $5,000. Above the lines provided on the back of this draft for endorsement was typewritten the condition that, "By endorsement hereof payee hereby releases from any and all claims arising out of the accident of 4-4-74 against Casualty Reciprocal Exchange and Mr. & Mrs. R. B. Callens."
Mann responded to this offer in a handwritten memorandum dated December 6, 1974 and addressed to CRE's claim representative. In this memorandum Mann expressed its unwillingness to release Callens in exchange for CRE's policy limits. Mann stated that it had already expended $3,462.33 in excess of the amount offered by CRE and still faced up to $204.20 exposure under the medical pay provisions of its policy and an unspecified amount of potential exposure under the disability provision of the policy. Mann informed CRE that it felt that Ellzey did not contemplate taking any further action against Callens or CRE and that Mann would be willing to fully release both CRE and Callens in exchange for CRE's $5,000 policy limits and a promissory note from Callens for the excess amount already paid Ellzey by Mann and the projected amount of medical expenses that Ellzey's doctors felt likely to be incurred up to Mann's policy limits of $204.20. Mann ended this memorandum by asking CRE to "please relate the above proposal to Mr. Callen (sic)." Mann retained possession of the $5,000 draft sent by CRE.
The record is devoid of any further contacts between Mann or its insured and CRE or its insured during the period between this December 6, 1974 memorandum and February 14, 1975. However, it can be presumed that some form of negotiations continued because on February 14, 1975 CRE's claims representative sent a letter to Mann purporting to communicate CRE's and Callens' acceptance of an offer by Mann to settle all claims arising out of the April 4, 1974 accident in exchange for $5,000 from CRE and $2,633.30 cash from Callens. CRE stated in this letter that it would secure a draft for this excess amount as soon as CRE received from Mann and Ellzey a release for $7,633.30. It was stipulated by counsel for both CRE and Mann that this letter was never received by *1042 Mann. Mann never sent the requested release and CRE never secured the additional funds.
There were no further communications between Mann or Ellzey and CRE or Callens after this February 14, 1975 letter. April 4, 1975 was the anniversary date of this accident. Neither Ellzey nor Mann filed suit against CRE or Callens for the damages resulting from this accident by the end of that day. On May 8, 1975 Mann presented the $5,000 draft for payment and was told that CRE had stopped payment on it some time after the anniversary date of the accident. On April 29, 1976 Mann filed suit against CRE seeking to recover the $5,000 policy limits of CRE's liability insurance policy with Callens.
The trial court filed written reasons upholding Mann's contention. The court found that the understanding expressed by the February 26 letter was that Mann would negotiate the $5,000 draft it held from CRE and would later get a separate $2,633.30 by draft or note from Callens. The court interpreted this arrangement to have envisioned two separate and independent settlements, one between Mann and CRE, the other between Mann and Callens. The failure of Callens to carry out his agreement did not, the court felt, excuse CRE from its agreement to pay its $5,000. Accordingly, the trial court rendered judgment against CRE for $5,000 with legal interest running from the time of the dishonor of the $5,000 draft. CRE appeals. We reverse.
After a careful review of the record in this case it is our conclusion that no valid contract of transaction or compromise was ever confected between CRE and Mann. Louisiana Civil Code Article 3071 defines this species of contract.
"A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
This contract must be reduced to writing."
If this type of contract is to have any validity it must possess the essential elements of any type of contract, including that of offer and acceptance. Branch v. Alexander, 231 La. 487, 91 So.2d 767 (1956). This threshold requirement has not been met in this case.[1]
As we read the evidence in this case, there certainly existed a dispute between CRE and Mann that would have been subject to transaction or compromise. Without any determination of the existence or allocation of any fault Mann asserted that CRE and its insured were liable to Mann in an amount somewhere in the neighborhood of $8,400.00. CRE by its September letter and accompanying draft proposed to settle this claim. CRE offered Mann $5,000 in exchange for a full release of it and its insured from any further liability to Mann or its insured. Mann's December memorandum in response to this offer stated Mann's unwillingness to accept this amount, but *1043 indicated its willingness to settle the dispute for an additional $3,400 to $3,600 promissory note from Callens. The contents of this memorandum did not conform with the offer made by CRE in the September letter. The memorandum contained an entirely different proposal to settle the dispute between the parties. Hence no contract was then confected between Mann and CRE. Mann's December memorandum must be read as a counter offer and a rejection of the original offer from CRE. Louisiana Civil Code Articles 1805, 1806; Wometco Communications, Inc. v. Luts, 357 So.2d 877 (La.App. 1st Cir. 1978), writ denied; Ekco Distributors, Inc. v. Moore, 355 So.2d 1047 (La.App. 4th Cir. 1978); Foster v. Tullos, 341 So.2d 85 (La.App. 3d Cir. 1976); Marine Chartering (Gulf) Ltd. v. Boland Machine & Manufacturing Co., Inc., 273 So.2d 316 (La.App. 4th Cir. 1973).
Neither did the February 14, 1975 letter from CRE to Mann confect an enforceable contract. The terms of this letter purported to accept an offer of settlement made by Mann although we have no evidence of such an offer having been made. But even assuming that the words of acceptance in this letter conformed to the terms of an offer of settlement made by Mann there would still be no contract. Articles 1797, 1809 and 1819 of the Louisiana Civil Code[2] indicate that the act of acceptance of an offer must be communicated to the offeror in order for a contract to be confected. Both parties to this appeal agree that the February letter was never received by Mann. There is no evidence that Mann was made aware of this purported acceptance. Hence, acceptance was never communicated to Mann and no contract was entered into between Mann and CRE before prescription ran on the claim asserted by Mann.
Actually, the condition of acceptance presented by CRE to Mann in this February 14 letter was never satisfied by Mann. The February letter read in pertinent part, "Please forward me a release signed by you and your insureds for $7,633.30, and I will secure the $2,633.30 and mail it to you. Your release will not be released until I secure a bank draft." This letter, like the initial settlement offer from CRE in September, 1974, stressed the receipt by CRE of a release in favor of it and its insured, Callens. We feel that CRE effectively communicated to Mann the fact that such a release was a condition to and the principal cause for any obligation that it might undertake. No such release was ever executed by Mann. The exposure of Callens and CRE to liability was terminated only by running of the one year prescriptive period. Hence this condition never was satisfied by Mann and the express principal reason for CRE to settle was never achieved.
Mann contends, however, that no such release was required of it. Mann bases this argument on the fact that a release was *1044 contained in the draft originally submitted by CRE and that this release was effected when the draft was endorsed by Ellzey. We cannot agree. Mann would have this Court read the September letter and accompanying draft as an offer by CRE to Ellzey through Mann. This interpretation is not supported by the evidence. It must be remembered that the initial claim on CRE and its insured was made by Mann, and not by Ellzey. Further, the $5,000 draft was made payable to Mann and Ellzey and two signature lines were provided for endorsement. While it is true that Ellzey did endorse the draft timely Mann did not, choosing instead to reject this offer and submit to CRE and its insured a counter proposal of its own. CRE made one offer to Mann and Ellzey. This offer was not accepted by Mann and Ellzey. Mann did not attempt to deposit this $5,000 draft until after prescription had run and also after CRE had stopped payment on it. In order for CRE's September offer to ripen into an enforceable contract, both Ellzey and Mann had to endorse the draft.
Mann also contends that under the facts of this case there existed an account stated in the amount of $5,000 between CRE and Mann. Mann bases this argument on the statements made by CRE in its September letter that, "Mr. Callens carries 5/10/5 liability coverage. I have attached our draft for $5,000.00, which is our limit of liability, payable to your company and Mr. David Ellzey." We do not see how this statement or any other facts of this case can be construed to evince an account stated. An account stated under our law is an acknowledgment by the debtor of the amount of an account due. James v. Fellowes and Company, 20 La.Ann. 116 (1868); Peterson Sales Company, Inc. v. C-Moore Glass, Inc., 296 So.2d 397 (La.App. 2d Cir. 1974); Red Barn Chemicals, Inc. v. Lassalle, 350 So.2d 1315 (La.App. 3d Cir. 1977). Nowhere in the evidence do we find an acknowledgment by CRE that it was liable to Mann or to Ellzey for any certain amount of money. All that we have is a statement by CRE of the maximum amount for which it could be held liable should liability be assessed against its insured, Callens. At no time does it appear that any fault or liability on the part of Callens or CRE was either admitted or established. Hence, no account stated has been created between CRE and Mann.
For the reasons assigned, the judgment of the district court is reversed. All costs are assessed to plaintiff-appellee.
REVERSED.
NOTES
[1] Louisiana Civil Code Articles 1805 and 1806 are particularly applicable to this case.

Art. 1805. The acceptance to form a contract must be in all things conformable to the offer; any condition or limitation contained in the acceptance of that which formed the matter of the offer, gives him, who makes the offer, the right to withdraw it.
Art. 1806. This takes place, even when more is promised than was demanded, or when less is offered than was required; for example, if a request is made to borrow fifty dollars, and the party answers that he will lend one hundred dollars; or, if the request be to borrow one hundred dollars, and the answer that fifty will be lent, there is no obligation in either case, without a further assent of the borrower to take the one hundred, in the first case, and the fifty in the other; for the proposal to borrow fifty does not necessarily imply an assent to borrow one hundred, nor does the proposal to lend one hundred necessarily imply a desire to lend only fifty. The modification or change of the proposition is, in all respects, considered as a new offer, and the party making it, is bound by the acceptance in the same manner as if the original proposition had been made by him.
[2] Art. 1797. When the parties have the legal capacity to form a contract, the next requisite to its validity is their consent. This being a mere operation of the mind, can have no effect, unless it be evinced in some manner that shall cause it to be understood by the other parties to the contract. To prevent error in this essential point, the law establishes, by certain rules adapted to the nature of the contract, what circumstances shall be evidence of such consent, and how those circumstances shall be proved; these come within the purview of the law of evidence.

Art. 1809. The obligation of a contract not being complete, until the acceptance, or in cases where it is implied by law, until the circumstances, which raise such implication, are known to the party proposing; he may therefore revoke his offer or proposition before such acceptance, but not without allowing such reasonable time as from the terms of his offer he has given, or from the circumstances of the case he may be supposed to have intended to give to the party, to communicate his determination.
Art. 1819. Consent being the concurrence of intention in two or more persons, with regard to a matter understood by all, reciprocally communicated, and resulting in each party from a free and deliberate exercise of the will, it follows that there is no consent, not only where the intent has not been mutually communicated or implied, as is provided in the preceding paragraph, but also where it has been produced by
Error;
Fraud;
Violence;
Threats.